Filed 9/21/22  In re A.M. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.S.,<br><br>        Defendant and Appellant. | A164435<br><br>(Alameda County<br>Super. Ct. No. JD-028000-02) |

M.S. (Father), father of minor A.M., appeals from an exit order granting the child's mother, C.M. (Mother), joint legal custody.  Father contends the juvenile court erred and abused its discretion because the court's factual findings in support of the order that Mother was not actively relapsing from alcoholism and was receiving substance abuse treatment were based on off-the-record discussions and unsworn statements of Mother's counsel, none of which was evidence.  We agree the court erred and will reverse and remand for a new hearing under Welfare and Institutions Code[1]

---

[1]        Further unspecified section references are to this code.

section 364 to determine the issue of legal custody on an adequate evidentiary record.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Dependency Petition

On September 1, 2020, the Alameda County Social Services Agency (Agency) filed a dependency petition under section 300, subdivisions (b) and (g), alleging that Father left six-year-old A.M. without adequate supervision, which led to the child waiting outside the home for several hours in the evening. The petition further alleged that Father left A.M. without adequate supervision on a previous occasion, and that he used excessive physical discipline on A.M., including slapping him in the face. Pursuant to section 300, subdivision (g), the petition alleged that Mother's whereabouts and her willingness and ability to provide care for A.M. were unknown.

### B. Detention Hearing

According to the detention report, Father left A.M. in the care of a neighbor and believed the child was safe in the neighbor's apartment, but the neighbor ended up leaving the child alone outside. Father believed the neighbor should be arrested, but he acknowledged his own poor judgment in leaving A.M. with the neighbor. The neighbor reported that Father had asked him to watch A.M. for 15 minutes but did not return for several hours, and that Father had left the child alone on previous occasions.

At the detention hearing in September 2020, the juvenile court ordered A.M. to be detained in temporary foster care.

### C. Jurisdiction and Disposition Hearing

In its jurisdiction and disposition report, the Agency recommended that A.M. be declared a dependent and returned to Father's home with family maintenance services. Mother's whereabouts were still unknown, and the

2

Agency asked the juvenile court to enter a finding that Mother was not entitled to reunification services, but that at its discretion, the Agency could provide her informal child welfare services.

The Agency reported that A.M. had a prior dependency case in 2017 after Father left the child unsupervised. After receiving six months of family maintenance services, Father was reportedly " 'taking great care of' " A.M. and the case was closed. Father was granted full physical custody of A.M. in 2017.

Mother had a prior dependency case in 2018 regarding A.M.'s half-sibling, C.S.M. According to the sustained allegations under section 300, subdivision (b)(1), Mother's alcohol abuse prevented her from adequately caring for the child, as Mother admitted to prenatal alcohol use and was hospitalized for acute alcohol intoxication while pregnant. Mother received six months of family reunification services, but services were terminated in early 2019. C.S.M. was adopted by relatives later that year.

Father told the Agency he was "dealing with a lot as a single parent to [A.M.]." He again acknowledged his mistake in leaving A.M. with the neighbor and agreed to a detailed childcare plan. He denied ever slapping A.M. and denied having a substance abuse problem. Father also provided a list of people in his support network who could watch A.M. when needed, and the social worker confirmed that several of these individuals could provide childcare. The foster parent reported that A.M. really missed Father and that they talked on the phone daily.

Father later provided the social worker with the results of drug testing, which showed that he "tested 'negative for everything.' " Father and A.M. had a visit in September 2020, and the child appeared "very comfortable and at ease" with Father and said " 'I miss you' " many times. The child later

3

reported that he was not sleeping well because he missed Father, his dogs, and the food at home.

At the first appearance on jurisdiction and disposition in September 2020, the juvenile court granted the Agency discretion to release A.M. to Father and scheduled a contested hearing. A.M. was returned to Father, and they "appeared thrilled to be reunited."

In an addendum report, the Agency reported that Mother had been located and was requesting custody even though she had "not been involved" in the child's life. Mother told the social worker she was living in the Helen Vine Recovery Center (Helen Vine) and was planning to remain in the program for 45 days. When asked about her lack of contact with A.M., Mother said she had been trying to get involved in A.M.'s life but "has been kept away" by Father, whom she called "a 'master manipulator.' "

Father completed five additional drug tests and "tested negative for all substances on all dates." When informed of Mother's interest in visitation with A.M., Father told the social worker that Mother has never complied with court-ordered treatment and has not been a consistent presence in A.M.'s life. Mother last saw A.M. three years prior, and they had no relationship at the time of the report. Father was concerned that A.M. would be hurt by Mother's reappearance in his life and that A.M. repeatedly said no when asked if he wanted his mother to visit.

At the contested jurisdiction and disposition hearing on October 22, 2020, the juvenile court declared A.M. to be a dependent under section 300, subdivisions (b) and (g), and ordered that A.M. reside in Father's home with family maintenance services. The court further found that Mother was not entitled to reunification services but would be provided informal child welfare

4

services at the Agency's discretion.  The court ordered weekly, 20-minute, supervised video visits between Mother and A.M.

### D. Review Hearings

#### 1. April 14, 2021

In its April 2021 status review report, the Agency recommended that the juvenile court dismiss the dependency case, terminate family maintenance services, and grant legal and physical custody and primary residence to Father and supervised visitation to Mother.

Mother had been residing at Helen Vine until January 2021, but her whereabouts were unknown at the time of reporting, and the Helen Vine "staff could not confirm [Mother's] whereabouts except that she was not there."  The Gathering Place visitation facility contacted the Agency and reported it could not reach Mother for visits with A.M.  Attempts to contact Mother at her last known address were unsuccessful.  On February 1, 2021, Mother contacted the Agency and said she was quarantined at Helen Vine due to being exposed to COVID-19.  The social worker spoke with the director of Helen Vine, who reported that Mother was "strong in her sobriety" and was attending Alcoholics Anonymous meetings and "working the 12 steps." Mother promised to maintain contact in the future and began attending parenting classes.

At the review hearing on April 14, 2021, Mother requested a contested hearing, as well as additional visitation.  The juvenile court scheduled a contested hearing date and granted Mother in-person, weekly, two-hour supervised visits at The Gathering Place.

#### 2. May 24, 2021

In an addendum report, the Agency reported that Mother and A.M. had a good video visit in April 2021, but that Mother "has recently disengaged

5

from visitation." She missed a video visit, as well as the first in-person visit in May 2021. Mother did not cancel either visit and could not be reached by telephone. Mother later explained, without elaboration, that "things have gotten difficult" for her. After failed efforts to reach Mother, The Gathering Place closed the referral for her visits. A.M. continued to say he did not want to participate in visits with Mother, and Father was having a hard time encouraging him to participate, as missed visits were stressful and traumatic for the child. Father told the social worker that prior to a video visit in May 2021, Mother had called Father and "was not making sense and sounded as if she had been drinking."

The social worker visited A.M. and reported no concerns. As for Mother, the Agency was "worried" that she "may have relapsed with alcohol, which impacts her ability to be present for [A.M.] during visitation and leads to [A.M.] being disappointed and possibly traumatized by his mother not showing for visits." The Agency stated that A.M. was "negatively impacted by Mother being inconsistent in his life" and that "[t]hroughout the reporting period, [A.M.] has maintained that he does not want to have visits with his mother."

At the contested family maintenance review hearing on May 24, 2021, the juvenile court found that conditions justified continued dependency jurisdiction and ordered individual therapy for A.M. and therapeutic visitations between A.M. and Mother, with the requirement that Mother confirm her attendance 24 hours in advance.[2]

---

[2] Father appealed the order continuing dependency jurisdiction (case No. A162901) but later requested dismissal of the appeal after the dependency case had been dismissed. We dismissed the appeal on March 14, 2022.

### 3. August 27, 2021

On August 27, 2021, both parents attended a hearing addressing visitation issues and therapy for A.M. The juvenile court directed Father to facilitate make-up visits for those he and A.M. would miss while on vacation. Father objected to A.M. undergoing individual therapy, while Mother told the court that she believed it would be helpful for A.M. to have someone to talk to, because "this has been very confusing for him," and "he's been saying things like he even thought I was dead for a little while." The court ruled its previous order for A.M.'s individual therapy would remain in place.

### 4. September 16, 2021

At a progress report hearing on September 16, 2021, the Agency reported that A.M. was "getting his needs met" through meditation sessions with Dr. Raen Thornberry. The juvenile court expressed concern that Dr. Thornberry was not a licensed therapist and requested additional information about his credentials.

### 5. September 28, 2021

At a continued progress report hearing, the juvenile court received a report from the visitation provider at Destined for Greatness indicating that Mother's visits with A.M. had gone well. Father "was very engaging and positive toward the mother," which had a positive effect on the visits.

The Agency reported that Father had found a licensed therapist and that A.M. had participated in the first few sessions. Father again explained his opposition to traditional therapy. Mother told the juvenile court that she had been reading and talking to her therapist about "parental alienation syndrome," and that she felt it was important for A.M. to have "a safe place to be able to talk to someone that's not influenced by [Father]." According to Mother, A.M. told the visitation provider, " 'I didn't even think I had a

7

mother. I told my friends I didn't have a mother.'" The court responded, "I think your point is well taken, mom. That there's some indication that [A.M.] has been alienated from you, and for reasons I don't need to go into, but that building that relationship up for his sake is important."

The juvenile court further observed, "This case did not come to the Court because of allegations regarding the mother. . . . [¶] Even watching the father's engagement, and I'm going to make a record about this, during these proceedings concerns me. The level of analysis and negativity. Even right now I've tried to keep everyone's audio muted because . . . everything I'm saying there's like this huffing and puffing, everything. [¶] . . . [¶] I am absolutely concerned about [A.M.'s] ability to continue to build a relationship with his mother because the parents have a difficult history." The court also noted the visitation provider's remarks that Father was "extremely challenging to work with around compliance, cooperation, and restraint" and had expressed "strong emotions and beliefs around the state of the mother" that had "proven negatively detrimental to the minor child."

The juvenile court reiterated that A.M. needed to be in therapy because it had "real concerns about [A.M.'s] ability to sustain a relationship with the mother," "which will affect his ability to sustain a relationship with women in the future. . . . Maybe he may be living in the home with dad. You may be the primary caregiver. His physical custody may be with the father, but that does not affect his ability—he should not think that his mother is deceased. He should not feel that his mother doesn't exist. He should have a relationship with her if she's able and capable of having one with him." The court concluded the hearing by reaffirming that "the order's still in place. We'll be back in a very short period of time to address how that therapeutic intervention is going."

8

### 6. October 14, 2021

The Agency filed a status review report in advance of the 12-month family maintenance review hearing recommending that family maintenance services continue for Father and that informal child welfare services continue for Mother. The Agency reported that home visits were "challenging" because Father "continue[ed] to disagree with [A.M.] having therapy due to his professional, religious and moral beliefs," but that A.M. had been receiving therapy with Maria Paull, MFT, as well as meditation counseling services with Dr. Thornberry.

Mother told the social worker she was maintaining sobriety, testing weekly, and engaging in outpatient services. The social worker obtained signed release forms from Mother and was in the process of verifying Mother's sobriety and test results. In June 2021, the social worker visited Mother at her residence in a sober living environment and reported no concerns.

During the reporting period, both parents had been in the hospital for extended periods of time, which delayed the start of therapeutic visits for A.M. and Mother. After her hospitalization, Mother completed a parenting class and consistently attended therapeutic visits with A.M. at Destined for Greatness. A.M. was "positively impacted by having visits with his Mother."

At the October 14 review hearing, the Agency recommended that the case remain open to allow ongoing court oversight of visitation. Mother's counsel requested clarification about Mother's involvement in decisions concerning A.M.'s education and medical providers. The juvenile court stated "there's nothing barring the mother from getting medical information, being involved in medical appointments, or educational appointments, et cetera," and it directed the parents to work out these issues in mediation. The court

9

set the matter for a progress report hearing in November and a contested review hearing in December.

Following this hearing, on October 19, 2021, the Agency filed a "therapeutic visitation summary" by JaDawn Bean, MSW, from Destined for Greatness as an attachment to the Agency's status review report. Bean reported that six visits took place between August 14 and October 9, 2021, and the sessions were described as "effective, positive, and both emotionally and physically safe." Bean stated that Mother had "made great efforts" to be involved in A.M.'s life, but that she needed to learn to parent more. Bean further reported concerns of parental alienation of Mother by Father, as Father had "great influence over the child even when that influence is not always positive." Indicators included A.M.'s parroting of Father's language and believing his mother did not exist or was dead. Father also did not tell A.M. that Mother provided gifts and party favors for his birthday party. The summary also included concerns about Father's disclosure of case information with A.M. Bean requested that Father no longer communicate directly with her because he was "combative, unproductive, antagonizing, and berating."

### 7. November 10, 2021

The matter was heard for a continuing progress report on November 10, 2021. Father requested information about Mother's recent illness, which led to a missed visit. Father also requested a new visitation location due to difficulties with the provider at Destined to Greatness. The juvenile court refused to change the visitation location and reminded Mother to notify Father if she would miss a visit. The court ordered visits to continue and reset the contested review hearing date for January 12, 2022.

### 8. Incident at Destined for Greatness

On November 23, 2021, the Agency filed a report for an incident that took place at Destined for Greatness on November 13, 2021. As detailed by Bean in the report, Mother arrived late for the visit and was accompanied by a person she identified as " 'someone who is helping her.' " Mother "was unrecognizable" and "look[ed] unlike herself." Her eyes were "fluttering," she was "tottering on her feet," and her speech was "deeper and slower." Mother's companion attempted to speak to the provider, but Mother told the companion to be quiet. When Bean attempted to speak to the companion, Mother "explodes and yells, screams, curses, and threatens the accomplice about saying another word." Mother "cannot be de-escalated and is asked to return to their vehicle. [Mother] continues to escalate further, becomes combative and uncooperative. Neighboring tenants surface from their suites preparing to call police and parents are threatening to end their visits out of fear of [Mother's] histrionics." Mother then "further escalates," getting into an altercation with a building tenant, and had "to be separated and escorted to another area." As Bean helped Mother into her car, Bean noted that the floor of the vehicle was "covered in cans of alcoholic seltzers." Mother continued to yell from the parking lot, and "[a]fter a long delay, continued unruly and disruptive behavior from [Mother]," the parties left when Bean threatened to call the police. According to Bean, Mother's behavior violated several of the facility's safety policies and conduct expectations, and it was "even more alarming that [Mother] did not have the know-withal that under no circumstances was she capable or was it appropriate to visit the minor in her condition. Substance abuse has not been determined by the agency as the cause for [mother's] impairment, but it can strongly be considered as the

11

culprit based on presenting symptoms." As a result of the incident, Destined for Greatness suspended Mother's services.

The Agency filed an ex parte application to suspend Mother's therapeutic visits with A.M. until she submitted three consecutive, random, clean drug tests and met other requirements. The Agency reported that a social worker made multiple attempts to reach Mother but was unsuccessful, and that Mother had apparently relapsed. On December 5, 2021, the juvenile court issued an order suspending Mother's visits with A.M. until the necessary steps were completed.

### 9. January 12, 2022

On December 13, 2021, the Agency served notice of the January 12, 2022, hearing on all parties. The notices indicated that the Agency's recommendation was "dismissal." The Agency then filed an addendum report for the hearing indicating it was changing its prior recommendation of continued dependency and family maintenance services, and recommending that the dependency be dismissed, that family maintenance services be terminated, and that Father be given full legal and physical custody of A.M. with primary residence. The Agency further recommended that Mother be granted supervised visits at minimum once a week for two hours, with Mother paying the costs of the visits. Father was in agreement with the recommendation, while Mother's position was unknown because the social worker was unable to reach her.

The addendum report described the November 13 incident at Destined for Greatness and the Agency's unsuccessful efforts to make contact with Mother thereafter. According to the social worker, on December 14, 2021, Mother sent a text message "stating that she needed to talk, however, the

[social worker] has been unable to make contact with Mother to follow up on her text message or to review the recommendations on the Addendum."

The social worker met with Father and A.M. at their new home on December 14, 2021, and the worker did not note any concerns about Father, A.M., or the home. The social worker explained to Father that future supervised visits for Mother could take place at Rally Visitation Center (Rally). Father reported that A.M. was still attending therapy and would be transferring to a new elementary school in the new year. The social worker visited A.M. at his school, and A.M. reported that things were going well at home, but that he missed seeing Mother. The social worker also contacted A.M.'s therapist, Paull, who confirmed that she had seen A.M. in November, and that no further appointments were scheduled.

The Agency made a referral to the Sister-to-Sister program to provide Mother with drug testing and outpatient services. The social worker was "worried" that Mother "has relapsed into her addiction" due to the worker's inability to reach Mother through phone calls or text messages. According to the report, Mother "has not been responsive to the Agency and has not attempted to initiate visits with [A.M.]."

Attached to the Agency's addendum report were Judicial Council Forms JV-200 (Custody Order—Juvenile—Final Judgment) and JV-205 (Visitation (Parenting Time) Order—Juvenile). Form JV-200 contained the Agency's recommendations to grant Father sole legal custody of A.M. and primary residence. Form JV-205 provided the recommended terms of Mother's visits, including that they take place weekly for a minimum of two hours and are supervised by a professional visitation agency such as Rally. The reason for supervised visitation was that Mother "has not made substantial progress" in her court-ordered "[a]lcohol abuse treatment program with random testing."

13

At the January 12, 2022, hearing, the juvenile court began by indicating "we discussed off the record that this case will be continued until the afternoon." After counsel stated their appearances, the court remarked, "So we've discussed off the record that it would be appropriate to continue the matter until this afternoon. I hate to jam [the social worker] up, but she says she's able to make some minor changes in the JV-200, and then also the JV-205, and get that to the court for this afternoon." The matter was then put over to the afternoon session.

At the afternoon session, the juvenile court began by stating, "So we've had many conversations off the record. And I'll let counsel make their records, but I know that there is a request for [Mother's counsel] specifically to continue the matter so that visitation can be set up and can get rolling before there's the dismissal." The court continued, "We've also discussed at length the change in the JV-200, or custody orders." Turning then to county counsel to "make your record," the Agency's counsel argued that "given the mother's relapse, the Agency is no longer in support of keeping this matter open," and future disagreements between the parents could be handled in family court. Counsel then indicated that amended custody orders had been submitted, i.e., "[j]oint legal custody, and physical custody in the residence with the father, and supervised visitation for the mother."

Mother's counsel agreed with the joint legal custody recommendation but asked that dependency jurisdiction continue based on her belief "that there could be in the future soon a problem with the visitation with compliance. Also having to do it on video as the pandemic."

Father's counsel agreed with the Agency's dismissal recommendation but objected to Mother's continuance request and to the Agency's joint legal custody recommendation. Addressing concerns expressed earlier by Mother's

14

counsel that Mother "has a right to know the child's grades, or if he's sick," Father's counsel argued that sole legal custody for Father did not mean that Mother would forever lose the right to participate in medical and educational decisions for the child. Instead, Mother would not have the ability to make those decisions "[a]t this time" due to her relapse.

Mother's counsel responded by stating that Mother was "in a sober living placement. She's planning to start a job I think next week, or this week. [¶] . . . [¶] She had tested. She's willing to give those tests over to Rally. [¶] I think she is more than capable at this point to share in some of that legal decision making, and have the option of seeing her son's records. Otherwise, we rely on the father, which as history has shown, is not that reliable in giving over information, medical, dental, education, et cetera. She is more than capable to make those decisions. [¶] If she's making an inappropriate decision, I'm sure the school will write something down, or the doctors will say something. And at that point if she relapses, or whatever may or may not happen in the future, then the father has the same option to go to Family Court."

The juvenile court denied Mother's continuance request, finding that the conditions no longer justified the assumption of dependency jurisdiction. Turning to the exit orders, the court first addressed visitation and ordered Father to call Rally to set up an evaluation so that supervised visits could begin.

On the issue of custody, the juvenile court remarked: "I think that the argument that mother is unable to make decisions because she has relapsed is not the same as saying mother is actively in her addiction now. It sounds like mother is taking steps to make sure that she is trying to cure whatever the issue is by being in a sober living, and moving forward in a positive

15

direction regarding the continued recovery. [¶] So I disagree that the mother is not in a position, or I disagree that the mother's potentially unable to make decisions for the minor, or to engage in the minors' activities, including medical things, educational things, et cetera, and that she should not be granted joint legal custody as a result." The court continued, "Parents who have joint legal custody have relapses as well. Again she's not actively relapsing or in her addiction now, and I do think joint legal custody is appropriate for the parents and [A.M.]"

At the conclusion of the hearing, the juvenile court indicated it would "follow the recommendations . . . on page 10" of the Agency's addendum report. The court stated its express findings that conditions did not exist and were not likely to exist which would justify the continued assumption of section 300 jurisdiction. The court further ordered that "[c]ustody shall be as set forth in the custody orders."[3] The case was dismissed, and this timely appeal followed.

## DISCUSSION

Section 364, subdivision (a), requires the juvenile court to conduct a review hearing every six months for a dependent child who has been placed in the physical custody of a parent. (See *In re T.S.* (2020) 52 Cal.App.5th 503,

---

[3] Father suggests there are discrepancies in the record regarding the juvenile court's ruling because the record does not contain a file-stamped revised JV-200 order providing for joint legal custody, and the court's oral ruling adopting the recommendations "on page 10" of the Agency's addendum report (which attached an order for *sole* legal custody to Father) conflicts with the minute order providing for joint legal custody. We find no inconsistency between the court's oral and written rulings that would require us to choose between the two. (See *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1259, fn. 9.) It is clear from the minute order and the totality of the court's oral pronouncements during the January 12, 2022, hearing that the court ordered joint legal custody.

16

512 (*T.S.*).)  The juvenile court must terminate jurisdiction over the dependent child unless the conditions that initially justified jurisdiction still exist or are likely to exist if supervision is withdrawn.  (§ 364, subd. (c).)

Upon termination of jurisdiction, the juvenile court is authorized to issue a so-called " 'exit order' " determining child custody or visitation.  (*T.S.*, *supra*, 52 Cal.App.5th at p. 513, citing § 362.4.)  The exit order becomes part of the family law file and remains in effect "until modified or terminated by a subsequent order of the superior court."  (§ 362.4, subds. (b), (c); see Cal. Rules of Court, rule 5.700.)  "When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.' "  (*T.S.*, at p. 513.)  " '[T]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion . . . order[s] in accordance with this discretion.' "  (*In re Corrine W.* (2009) 45 Cal.4th 522, 532 (*Corrine W.*).)  We review exit orders for abuse of discretion and any underlying factual findings for substantial evidence.  (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.)

At issue here is the juvenile court's exit order granting Mother joint legal custody over A.M.  Father contends the juvenile court erred and abused its discretion because its order was not based on evidence but on off-the-record discussions and unsworn statements of Mother's counsel.

In determining custody, the juvenile court is not restrained by any preferences or presumptions that ordinarily apply in family court, such as the presumption of parental fitness or the presumption that joint legal custody is in the child's best interest.  (*In re Chantal S.* (1996) 13 Cal.4th 196, 201, 206 (*Chantal S.*), citing *In re Jennifer R.* (1993) 14 Cal.App.4th 704 (*Jennifer R.*).)  " '[A]lthough both the family court and the juvenile court focus on the best interests of the child, the juvenile court has a special responsibility to the

17

child as *parens patriae* and must look at the totality of the child's circumstances.' " (*Chantal S.*, at p. 206.)

There is no dispute that a parent's substance abuse is a relevant consideration in fashioning an exit order regarding custody under section 362.4. (See, e.g., *Jennifer R.*, *supra*, 14 Cal.App.4th at p. 713 [upholding refusal to award joint legal custody to mother who "did not follow through on drug rehabilitation referrals and failed to drug test while assuring her therapist she was drug free and had completed rehabilitation"].) And as recounted in our statement of facts, Mother has a history of alcohol abuse that bears on her parental fitness. Mother had lost parental rights to A.M.'s half-sibling in or around 2018 due to alcohol abuse, and her first contact with the Agency in the instant case occurred while she was in substance abuse treatment at Helen Vine. Moreover, the detailed account of Mother's behavior during the November 13 incident strongly suggests she was under the influence of substances that contributed to her belligerent and uncontrolled manner. None of this evidence was disputed, nor did Mother attempt to rebut the Agency's suspicions that Mother was under the influence during the November 13 incident.

But significantly, the juvenile court's decision to grant Mother joint legal custody was directly premised on its factual findings that Mother was "not actively relapsing or in her addiction" at the time of the hearing and was "taking steps to make sure that she is trying to cure whatever the issue is by being in a sober living" environment. As Father observes, however, these findings are not supported by any evidence in the record. Instead, the findings appear based on representations made by Mother's counsel during discussions both on and off the record, which do not suffice as evidence. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11 [unsworn statements of

18

counsel are not evidence].)  Although we must generally indulge all inferences in favor of the juvenile court's factual conclusions, those conclusions must be based upon evidence that appears in the record.  (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 794–795.)  Without actual evidence that Mother was receiving substance abuse treatment and was not relapsing, the juvenile court could not appropriately make an informed decision on custody based on the stated findings.

In urging affirmance of the order, the Agency argues that other evidence in the record supported the finding that joint legal custody would be in A.M.'s best interests.  Specifically, the Agency notes that at the September 28, 2022, hearing, the juvenile court cited the importance of building A.M.'s relationship with Mother, which would " 'affect his ability to sustain a relationship with women in the future.' "  The Agency thus urges that "[o]rdering joint legal custody was consistent with not only the court's stated goals and priorities, but with past orders to encourage mother-son visitation and bonding."  We are not persuaded.

As Father points out, the Agency's argument improperly conflates joint legal custody with visitation.  Joint legal custody pertains to a parent's right and responsibility to share in making decisions relating to the child's health, education, and welfare (Fam. Code, § 3003), while visitation pertains to the time spent between parent and child "to maintain ties" between them. (§ 362.1, subd. (a).)  Thus, while the court's remarks on the importance of the relationship between Mother and A.M. were reasonably related to the issue of Mother's visitation rights (which Father does not challenge), they did not appear to bear on the separate question of her fitness to share in the right and responsibility of parental decision making.

The Agency further argues that vesting sole legal custody in Father is not in A.M.'s best interest because it "will increase [Father's] considerable, negative, influence over A.M. and will allow him to further alienate the minor from Mother with enduring repercussions." We note the juvenile court did not expressly base its joint legal custody order on concerns about parental alienation. Nonetheless, we acknowledge that the record reflects concerning behavior by Father in this regard, and we accept as a general matter that a joint legal custody order may serve to counteract a custodial parent's tendencies to marginalize a noncustodial parent. That said, the juvenile court was mindful of these concerns when it ordered therapeutic visitation between Mother and A.M. and therapy for A.M., and admonished Father for his conduct. Father eventually complied with the case plan to the court's satisfaction, and the court issued an exit order regarding visitation that will allow Mother and A.M. to continue building their relationship. But the separate issue remains whether Mother's alcohol abuse, if unresolved, will impair her judgment and ability to work cooperatively with Father in making important parenting decisions for A.M.

The Agency casts doubt on Father's ability to be the "sole arbitrator" in decisions regarding A.M. because, using the juvenile court's words, " 'this case did not come to the Court because of allegations regarding the [M]other,' " but rather, " 'the two times this case has been in front of [the court] now for different dependency matters' " was due to the actions of the Father. But this argument overlooks the fact that the juvenile court sustained an allegation under section 300, subdivision (g), regarding Mother's uncertain ability to provide care for A.M. Indeed, while Father successfully addressed his conduct leading to the dependency, Mother maintained only inconsistent (albeit sometimes successful) visitation with A.M. and failed to

20

submit evidence of sustained progress in addressing her substance abuse. Thus, while it is true that the dependency proceedings were triggered by Father's lapses, it is incorrect to suggest that actual evidence of Mother's rehabilitation was unnecessary in order for the juvenile court to make an informed decision on granting joint legal custody.

Finally, the Agency argues that joint legal custody will not negatively impact A.M.'s safety because, in the words of Mother's trial counsel, any inappropriate decision by Mother will prompt the school to " 'write something down' " or the doctors to " 'say something.' " The Agency also posits that if "Mother's future actions put A.M.'s emotional and physical well-being in question, Father may seek remedy in the more appropriate venue of family court." We are not persuaded that the appropriate solution here is to delegate monitoring the effects of Mother's potentially unresolved alcoholism to A.M.'s teachers and doctors, or to Father, or to the family court. The record before the juvenile court raised serious questions about Mother's substance abuse and her ability to competently and cooperatively work with Father in making decisions relating to A.M., and the juvenile court has a " 'special responsibility' " to the minor " 'as *parens patriae*' " (*Chantal S.*, *supra*, 13 Cal.4th at p. 206) to base its custody order on evidence of Mother's fitness in order to make an informed decision about A.M.'s best interests. Moreover, allowing the joint legal custody order to become part of the family law file on the current record would unfairly place the burden on Father to show a "significant change of circumstances" (Cal. Rules of Court, rule 5.700(a)(1)) in order to obtain modification.

Having determined the joint legal custody order was issued in error, we proceed to assess whether the error was harmless. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 624.) Reversal in a dependency case is justified " ' "only when

21

the court, 'after an examination of the entire case, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the [petitioning] party would have been reached in the absence of the error." ' " (*B.B. v. Superior Court* (2016) 6 Cal.App.5th 563, 572.)

Without knowing the substance of the unreported discussions between counsel and the juvenile court, we cannot say the error here was harmless. At most, we can discern that representations were made regarding Mother's substance abuse treatment and testing, but there was no indication as to how long Mother had been sober, the number and results of her tests, and the details and severity of her apparent relapse in November 2021. Nor is there any indication as to whether any off-the-record statements of Mother's counsel were corroborated or admitted by Father, the Agency, or other parties. In light of Mother's history of alcohol abuse, we are doubtful that a brief or fleeting period of sobriety at the time of the section 364 hearing— even if supported by evidence—would suffice to establish that joint legal custody is in A.M.'s best interest. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].) That said, given the juvenile court's broad discretion to determine A.M.'s best interests in fashioning exit orders (*Corrine W.*, *supra*, 45 Cal.4th at p. 532), we leave it to the juvenile court to make the ultimate determination of whether Mother has shown sufficient rehabilitation based on any evidence adduced on remand.[4]

---

[4]    In light of our conclusion, we need not reach Father's additional contentions that the juvenile court's acts of discussing matters off the record and basing its exit order on the unreported discussions constituted abuses of discretion, or that the Agency's section 364 hearing notice was inadequate because it did not indicate a recommendation of joint legal custody.

**DISPOSITION**

The joint legal custody order is reversed, and the matter is remanded with directions to the juvenile court to hold a new section 364 hearing on the issue of custody consistent with the views expressed in this opinion.

_____
Fujisaki, Acting P.J.

WE CONCUR:

_____
Petrou, J.

_____
Rodríguez, J.

*Alameda County Social Services v. M.S.* (A164435)